**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LAURA M. GONZALES, | CASE NO. 3:13-cv-02620-JEJ-GBC |
| Plaintiff, | (JUDGE JONES) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | REPORT AND RECOMMENDATION<br>TO VACATE THE DECISION OF<br>THE COMMISSIONER AND |
| Defendant. | REMAND FOR FURTHER<br>PROCEEDINGS |
| | Docs. 1, 8, 9, 12, 20, 23 |

## REPORT AND RECOMMENDATION

### I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Laura M. Gonzales for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). Here, the decision of the Commissioner lacks substantial evidence because, although the administrative law judge ("ALJ") found that Plaintiff had limitations in concentration, persistence, and pace, he did not include any related limitations in Plaintiff's residual functional capacity ("RFC"). The ALJ also erred in discounting multiple medical opinions without providing

any reason. Moreover, the ALJ discounted another medical opinion solely because of an alleged lack of objective evidence, but the medical record is replete with objective findings.  As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

## II.    Procedural Background

On December 22, 2006, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 249-263). On September 19, 2007, the Bureau of Disability Determination denied these applications (Tr. 175-196), and Plaintiff filed a request for a hearing on October 5, 2007.  (Tr. 127-28). On January 7, 2010, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 108-135).  On February 9, 2010, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 148-69). Plaintiff filed a request for review with the Appeals Council, and the Appeals Council remanded to the ALJ to remedy multiple errors. (Tr. 172-74). On June 1, 2011, the ALJ held a second hearing at which Plaintiff—who was represented by an attorney—and a VE appeared and testified. (Tr. 82-107). On August 23, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 23-46). On March 26, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 8-19), which the Appeals

Council denied on August 20, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On October 23, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On January 29, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 8, 9). On April 17, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 12). On July 30, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 20). On September 2, 2014, Plaintiff filed a brief in reply. (Doc. 23). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and requires only "more than a mere

scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on February 28, 1965 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 37). She has a limited education and past relevant work as a help desk operator and administrative assistant. (Tr. 37).  Plaintiff was treated for pain

in her neck, spine, hip, and extremities, as well as for mental impairments from 2005 through the date of the ALJ decision on August 23, 2011. Plaintiff stopped working on May 30, 2002. (Tr. 310). She applied for disability benefits on September 5, 2006. (Tr. 244). Plaintiff amended her alleged onset date at the second hearing to May 10, 2007. (Tr. 87).

## A. Medical Records

On August 24, 2005, Plaintiff was evaluated by Dr. Victor Jaramillo at the Neurology Center. (Tr. 386). She had been referred by her primary care physician for evaluation of headaches. (Tr. 384). She was also complaining of neck pain, back pain, and dizziness. (Tr. 384). On exam, she had tenderness and pain on flexion, "light sensory deficit for pinprick and touch in both upper extremities," and spasm in her neck, cervical spine, and lumbar spine. (Tr. 385-86).

On September 6, 2005, Plaintiff had an MRI of her neck. (Tr. 423). It indicated "mild disc desiccation with a mild central C5-6 disc herniation with a central disc bulge at C6-7." (Tr. 423).

On September 28, 2005, Plaintiff followed-up at the Neurology Center. (Tr. 382). On exam, she had a "slight sensory deficit for pinprick in both upper extremities in a patchy distribution," but her exam was otherwise normal and she was scheduled for additional tests.   (Tr. 382). On October 21, 2005, Plaintiff followed-up at the Neurology Center. (Tr. 381). On exam, she had "slight to

moderate" muscle spasm in her cervical spine, moderate muscle spasm in her lumbar spine, limited range of motion in her spine, and brisk reflexes. (Tr. 381).

On October 27, 2005, Plaintiff had an MRI of her lumbar spine. (Tr. 387). It indicated "moderate disc desiccation and mild disc space narrowing at L5-S1 with a mild central herniation, without stenosis," and "minimal left-sided disc bulge at L4-5, without stenosis." (Tr. 387).

On December 2, 2005, Plaintiff saw Jennifer Manso, PA-C, at the Neurology Center for follow-up. (Tr. 416). She had muscle spasm in her lumbar spine, "bilateral severe [sacroiliac] joint tenderness," limited range of motion in her neck, swelling, edema, and ERBs point tenderness on the left. (Tr. 416). She was referred to physical therapy and "Dr. Artamonov" for pain management, received a sample of Lidoderm patches, and "advised not to lift any heavy objects greater than 5 to 10 lbs and avoid pushing and pulling type activities." (Tr. 416).

On February 3, 2006, Plaintiff saw Dr. Matt Vegari, M.D., at the Neurology Center. (Tr. 414). She was complaining of severe neck, back, and hip pain. (Tr. 414). She was "tearful and she said that she cannot sit or stand for any length of time and she has not been able to work." (Tr. 414). She reported that she could not go to the chiropractor for physical therapy due to insurance and did not want to see Dr. Artamonov because she "is frightened from needle and does not want to get any shot." (Tr. 414). On physical exam, she had limited range of motion in her

neck, muscle spasm in her cervical spine, trapezius muscles, thoracic spine, and lumbar spine, swelling on the left extending to the scapular ridge, and tenderness throughout. (Tr. 414). He continued her Darvocet and Elavil, which she had received from another physician, prescribed a hand brace, and advised her to "avoid lifting, pushing, and pulling of more than 5lbs." (Tr. 415).

On February 6, 2006, Plaintiff had an abnormal EMG of her lower extremities "most consistent with" acute S1 root irritation. (Tr. 420). On February 8, 2006, an MRI of her left hip showed mild increased signal that "can indicate a degree of bone bruise" and trochanteritis, but no fractures or joint effusion. (Tr. 418). On February 10, 2006, an MRI of her thoracic spine indicated "mild disc desiccation" and "broad left lateral T5-6 disc protrusion, likely a left lateral herniation, without cord compression or stenosis." (Tr. 419).

On March 17, 2006, Plaintiff followed-up with Dr. Vegari at the Neurology Center. (Tr. 413). On exam, she had swelling in her knee along with pain and "severe crepitation." (Tr. 413). She also had limited range of motion in her neck, spasm in her trapezius muscles, cervical spine, and lumbar spine, and tenderness. (Tr. 413). He scheduled her for additional diagnostic tests and continued her medications, but noted that Plaintiff "does not want to go to Dr. Artamonov for pain management because of being fearful." (Tr. 413).

On May 2, 2006, Plaintiff was evaluated by Dr. Daniel Muser, M.D, at Mahoning Valley Orthopedics. (Tr. 424). She reported a "ten year history of low back pain radiating to buttocks" with "some improvement with her chiropractic treatment but because of insurance issues can no longer see a chiropractor." (Tr. 425). Her physical exam indicated "some spasm on the left buttock," "straight leg raise on the left and right worse because of buttock pain," and "significant" crepitus in both knees. (Tr. 425). Plaintiff "requested to go to PT." (Tr. 425).

On July 18, 2006, Plaintiff saw Dr. Slobodan Miric, M.D, at the Neurology Center. (Tr. 470). On physical exam, she had tenderness and "sluggish" reflexes, but her gait was normal. (Tr. 470).  Dr. Miric prescribed her Celebrex, increased her amitriptyline, and requested additional diagnostic tests. (Tr. 471). On August 30, 2006, Plaintiff reported to Dr. Miric that her "back pain is well tolerated" but had pain in her knee and shoulder and she was using a hand brace for carpal tunnel syndrome. (Tr. 469). On exam, she had tenderness, a "positive external rotation of the left shoulder," and "sluggish" reflexes. (Tr. 469). He continued her Celebrex, prescribed Topamax, and scheduled additional diagnostic tests. (Tr. 469).

On September 8, 2006, an MRI of her left shoulder showed tendinitis with intrasubstance tears, but no full-thickness tears or "AC impingement." (Tr. 473). On September 8, 2006 an MRI of her right knee showed a minimal amount of joint

fluid, and a "1 cm oval focus of bone-like signal just posterior to the medial tibial plateau, likely in intra-articular loose body." (Tr. 472).

On September 20, 2006, Plaintiff followed-up with Dr. Miric. (Tr. 467). He noted that she was "also suffering from insomnia, chronic depression, and is applying for disability. She also uses Darvocet; however, Celebrex and Maxalt were denied to her [by her insurance]." (Tr. 467). She had tenderness and "sluggish" reflexes, but her exam was otherwise normal. (Tr. 467). He prescribed her Celexa, Ambien, and Imitrex, instructed her to take more Topamax, and noted that she was "fearful of interventional pain management." (Tr. 468). On October 18, 2006, Plaintiff followed-up with Dr. Miric. (Tr. 465). She was "very emotional and upset" in the office and had a depressed affect, but her physical exam was normal. (Tr. 465). He recommended that she see a psychiatrist, increased her Celexa, and continued her Topamax, naproxen, and Darvocet. (Tr. 466). On December 1, 2006, Plaintiff followed-up with Dr. Miric. (Tr. 464). She had spasm in her trapezius muscles, tenderness, and pain. (Tr. 464). Dr. Miric continued her medications, added Flexeril, and scheduled her for physical therapy. (Tr. 464).

On December 19, 2006, Plaintiff followed-up with Dr. Michail Atramonov, M.D., at Northeastern Rehabilitation Pain Management Center. (Tr. 474). She was still complaining of "significant low back and left lower extremity pain." (Tr. 474). Plaintiff "stated that injections worked better than it had in the past and is asking

for additional treatment." (Tr. 474). Her insurance would not cover Lyrica, and tramadol was not improving her symptoms. (Tr. 474). On physical exam, she had "significantly decreased range of motion of the cervical spine…increased tone in the cervical paravertebral musculature. Positive slump test on the left side with partial leg pain reproduction." (Tr. 474). Plaintiff was continued on tramadol, started on tizanidine, and scheduled for additional diagnostic tests. (Tr. 474).

On July 24, 2007, Plaintiff was seen at St. Luke's counseling center.  (Tr. 582). She had depressed and anxious affect and mood and reported less energy and less motivation, and needing two-hour naps each day. (Tr. 582). Her diagnoses included depression and PTSD. (Tr. 582). Her counselor observed "some thought-blocking." (Tr. 582). On August 1, 2007, Plaintiff had a psychiatric evaluation at St. Luke's Hospital. (Tr. 589). She reported that she had custody of her son and was residing in public housing. (Tr. 589). She reported severe depression and flashbacks of past abuse, but she was "not willing to discuss that issue at this time." (Tr. 589). She reported that she "cannot concentrate." (Tr. 589). Her mental status exam was normal and she was assessed a GAF of 60. (Tr. 591). On October 1, 2007, Plaintiff reported significant pain to her counselor at St. Luke's after taking a bus for two hours one-way, but felt better when she used a "taxi-type vehicle" instead. (Tr. 579). On December 5, 2007, she reported to her counselor

that her mood was "ok" but that her pain persisted, and "promise[d] to make an appointment with the neurologist." (Tr. 576).

On January 8, 2008, Plaintiff followed-up with Dr. Miric. (Tr. 526). Her depression had improved significantly with Abilify in combination with Cymbalta, but she was still complaining of problems in her spine, shoulders, and knees. (Tr. 526). Dr. Miric observed a "significant lumbar facet syndrome symptom that is positive with partial pain reproduction and significant tenderness over the facet joint." (Tr. 526). He also observed "mild compensatory obliquity and kyphoscoliosis of the spine" and tenderness in her spine, shoulders, and knees. (Tr. 526). Dr. Miric prescribed Meloxicam and Vicodin and scheduled her for additional tests. (Tr. 526).

On January 15, 2008, an MRI of her lumbar spine indicated "lumbar degenerative changes with disc desiccation," "disk bulge at the level of L3-L4, L4-L5, and L5-S1 with impingement of the thecal sac," and "narrowing of the neural foraminal at the level of L4-L5 and L5-S1 bilaterally." (Tr. 531). On January 16, 2008, an MRI of her cervical spine indicated "cervical degenerative changes with disc desiccation" and "central disk herniation at the level of C5-6 and disk bulge at the level of C6-7 with mild impingement of the thecal sac." (Tr. 530). On January 17, 2008, an MRI of her thoracic spine indicated "thoracic degenerative changes

with disc desiccation" and "disk herniation at the left of T5-6 (left side) and T7-8 (right side) with impingement of the thecal sac." (Tr. 529).

On January 30, 2008, an abnormal EMG of her left lower extremity was "most consistent with" a diagnosis of "left S1 root irritation subacute in nature." (Tr. 534). On February 1, 2008, an abnormal EMG of both upper extremities was "most consistent with" "bilateral median motor and sensory peripheral neuropathy of primarily demyelinating in nature across both wrists, consistent with bilateral carpal tunnel syndrome," "left ulnar motor and sensory peripheral neuropathy primarily demyelinating in nature across the wrist, consistent with left Guyon's tunnel syndrome," and "left C6 root irritation acute in nature." (Tr. 533).

On February 5, 2008, Plaintiff followed-up with Dr. Miric at the Neurology Center. (Tr. 603). She reported that she is "feeling fine with the combination of Mobic and Vicodin for her neck and lumbar spinal pain and it seems that this is helpful; however, she complains of having a pain in her knees and left hip….Laura is actually the best since ever I have seen her and it seems that the treatment is working well." (Tr. 603). She had tenderness in her spine and knee and limited range of motion in her hip. (Tr. 603).

On February 20, 2008, Plaintiff reported in a follow-up at St. Luke's that she cannot sit for long due to back pain. (Tr. 572). She also reported that she "used to get an adrenaline rush when [she] got things done" and that she did not feel that

she "get[s] much done now." (Tr. 572). Her therapist suggested that she "could" work "in the future" "as being home is contributing to her depression." (Tr. 572).

On April 8, 2008, Plaintiff followed-up with Dr. Vegari. (Tr. 538). He reported that she was under psychiatric care, that her medication was working, her mood had stabilized and that she has overall improved significantly from a psychiatric standpoint. (Tr. 538). However, she continued to have back and knee pain. (Tr. 538). She was "reluctant to receive interventional pain management. She just wants to continue with the pharmacotherapy and physical therapy." (Tr. 538). Objective findings included paravertebral tenderness, multiple active trigger points, facet loading test, and fluid shift in the right knee with painful knee ligaments. (Tr. 538). He "prescribed a back belt and bilateral knee braces as stabilizers to reduce the pain as well as to improve ability for physical therapy," renewed her Vicodin, and prescribed physical therapy. (Tr. 539).

On May 30, 2008, Plaintiff reported in a follow-up at St. Luke's that she "cannot concentrate." (Tr. 567).

On September 19, 2008, Plaintiff followed-up at the Neurology Center. (Tr. 536). She complained of short term memory problems. (Tr. 536). On physical exam, Plaintiff's "[f]undi [were] not well visualized…[Plaintiff] seems to be quite slow generally." (Tr. 536). She had tenderness in her shoulder, spine, and hip, and pain in her hip, but her gait was steady. (Tr. 536). Her reflexes were 1+ throughout.

(Tr. 537). Her medications were continued, she was prescribed another course of physical therapy, and was scheduled for a left hip and left shoulder MRI. (Tr. 537).

On September 29, 2008, Plaintiff had an MRI of her left hip showing "multiple uterine fibroids," a "large area of cystic-like signals to the left of the uterus," and "areas of increased signal within the acetabulum bilaterally likely areas of bone bruise, but no fracture of the neck." (Tr. 540).

On February 16, 2009, Plaintiff followed-up at the Neurology Center. (Tr. 601). She had swelling and protrusion in her left ankle and tenderness and pain on her left hand and wrist. (Tr. 601). She was prescribed Neurontin, her Mobic and Vicodin were continued, and she was scheduled for physical therapy. (Tr. 602). On May 18, 2009, Plaintiff reported that she "does have some degree of obsessive-compulsive disorder and does like to clean up tremendously and this gives her a lot of pain." (Tr. 599). She also reported that four weeks of physical therapy "did seem to help her, currently she thinks she needs more therapy." (Tr. 599). Her physical exam was normal except for mild tension and tenderness. (Tr. 599). She was prescribed physical therapy and her medications were increased. (Tr. 600).

On July 17, 2009, Plaintiff followed-up with Dr. Vegari. (Tr. 597). He observed that she "seems to be doing overall well." Her physical exam was normal except for mild tension and tenderness. (Tr. 597).

On October 15, 2009, Plaintiff followed-up at the Neurology Center. (Tr. 595). She was reporting increasing pain. (Tr. 595). Her exam revealed that her tongue was deviating slightly to the left, she had slightly decreased grip strength, decreased range of motion in the cervical spine, cervical and trapezius muscle spasm, cervical root tenderness, a positive Spurling test on the left, pain to palpation and muscle spasm in her lumbar spine. (Tr. 595-96). "The slump test [was] bilaterally positive causing radicular findings into the legs," she had tenderness in her sacroiliac joint, pain to palpation on her shoulder, twelve of the eighteen pressure points associated with fibromyalgia, positive "empty can and full can signs" and a Neer impingement sign. (Tr. 596). She was continued on her medications and prescribed Lyrica for fibromyalgia. (Tr. 596).

On October 20, 2009, an MRI of her cervical spine indicated "cervical degenerative changes with disc desiccation" and "central disk herniation at the level of C5-6 and disk bulge at the level of C6-7 with mild impingement of the thecal sac." (Tr. 611). On October 22, 2009, an MRI of her lumbar spine indicated "lumbar degenerative changes with disk desiccation," "disk bulge at the level of L3-L4, L4-5, and L5-SI with impingement of the thecal sac," and "narrowing of neural foramina at the level of L4-5 and L5-S1 bilaterally." (Tr. 610). On October 27, 2009, an MRI of her left shoulder noted that "the findings of tendinitis…have

resolved." (Tr. 609). On November 4, 2009, an EMG of her lower extremities noted subacute S1 root irritation. (Tr. 605).

On December 14, 2009, Plaintiff followed-up in the Neurology Center. (Tr. 593). She had "widespread pain consistent with fibromyalgia." (Tr. 593). She had slightly decreased grip strength, limited range of motion in the cervical spine along with cervical and trapezius muscle spasm and cervical root tenderness, positive Spurling test on the left, positive slump test bilaterally, positive straight leg raise on both sides, pain to palpation in the lumbosacral area, paraspinal lumbar muscle spasm, fourteen of the eighteen pressure points associated with fibromyalgia. effusion, crepitus, and pain in her knee and a positive McMurry test. (Tr. 594).

On December 22, 2009, an MRI of her left knee indicated "increased T2 signal within the soft tissues adjacent to the anterior aspect of the medial tibial plateau likely a soft tissue contusion." (Tr. 608). On February 2, 2010, an EMG of her left upper extremity "revealed significant spontaneous activities in the form of fibrillation and positive waves in the left brachioradialis and to a lesser degree in the left triceps as well as the cervical paraspinal muscles at the level of C5-6 on the left side. Early recruited motor units appeared moderately enlarged and polyphasic." (Tr. 647). Dr. Vegari opined that this was "most consistent with" diagnoses for "bilateral medical motor and sensory peripheral neuropathy of

primarily demyelinating in nature across both wrists, consistent with bilateral carpal tunnel syndrome" and "left C6 root irritation subacute in nature." (Tr. 647).

On February 17, 2010, Plaintiff followed-up with Dr. Vegari. (Tr. 645). He noted, "Tinel's and Phalen's are bilaterally positive. Reflexes are essentially unchanged." (Tr. 645). She had cervical, trapezius, and lumbosacral muscle spasm with root tenderness at C5-C6 and tenderness and L3-S1, limited range of motion in her neck and SI joint tenderness bilaterally. (Tr. 645). He prescribed a left and right hand brace, a TENS unit, and Savella, as her insurance would not cover Lyrica. (Tr. 646).

On March 30, 2010, Plaintiff saw Dr. James Liott, D.C., a chiropractor. (Tr. 634).  She reported that she was not doing physical therapy because it exacerbated her symptoms and, with regard to injections, she stated "I don't like them." (Tr. 631). She reported that her pain was eight out of ten on her best day and nine out of ten on that day. (Tr. 631). She "reported that she had a bad episode with cervical traction when this was performed on her in the past. She related that she increased pain for three days after." (Tr. 632). She reported numbness and memory loss. (Tr. 632). Her deep tendon reflexes were hyporeflexic but her patellar and Achilles reflexes were normal. (Tr. 632). She had "active myofascial trigger points, hypertonicity, and tenderness," limited range of motion in her cervical,  lumbar spine, thoracic spine, and left sacroiliac joint, a positive straight leg raise and

positive Braggard's sign. (Tr. 633). She was to begin treatment with him three times a week until her symptoms decreased, when they would taper off. (Tr. 634). On April 6, 2010, Dr. Liott observed "active myofascial trigger points, hypertonicity, and tenderness," and limited range of motion. (Tr. 621).

On May 17, 2010, Plaintiff followed-up with Dr. Vegari. (Tr. 642). She had limited range of motion in the neck, cervical and trapezius muscle spasm, mid-cervical root tenderness, midthoracic tenderness, lumbosacral muscle spasm, and tenderness in her lumbar region and hips. (Tr. 642). Her left shoulder was "about half an inch higher than the right side and she does have a temporary tilt of her head to the right." (Tr. 642). He wrote that "I indicated to Laura that if the pain persists and if it worsens then she will benefit from left trochanteric steroid injection and lumbar facet block. However, she is adamant about this. She does not wish to have any injection because she has a phobia of needles." (Tr. 642). He "advised her not to lift any heavy objects of more than 5-10 pounds and avoid pushing and pulling-type activities" and recommended home exercises. (Tr. 642).

On August 19, 2010, Plaintiff followed-up with Dr. Vegari. (Tr. 643). Plaintiff reported that a motor vehicle accident in June had exacerbated her pain. (Tr. 644). She had limited range of motion in the neck, cervical and trapezius muscle spasm, and mid-cervical root tenderness. (Tr. 642). Her left shoulder was "about half an inch higher than the right side and she does have a temporary tilt of

her head to the right." (Tr. 642). He "advised her not to lift any heavy objects of more than 5-10 pounds and avoid pushing and pulling-type activities." (Tr. 642).

On August 25, 2010, an MRI of the left shoulder indicated "fluid in the biceps tendon sheath," "subdeltoid bursitis," and "over focus of increased T2 signal in the proximal humeral shaft of indeterminate etiology this does not appear to be an expansite tumor lesion, but may be a vascular structure." (Tr. 817). On September 2, 2010, a CT scan of her right hip indicated an enlarged uterus and an adnexal cyst. (Tr. 782). On September 10, 2010, an MRI of her left hip showed uterine fibroids and a large cystic area, but both were smaller than previously observed. (Tr. 781).

On September 29, 2010, Plaintiff followed-up with Dr. Vegari. (Tr. 659). On physical exam, she had abnormal reflexes, decreased strength, decreased range of motion, swelling, and muscle spasms. (Tr. 659-60). Specifically, her reflexes were 3/4 in the right upper extremity, absent in the left knee, and absent in both ankles with a positive Erb's point tenderness. (Tr. 659). She had decreased strength in both upper extremities. (Tr. 659). She had decreased range of motion in her neck and muscle spasms in her cervical, thoracic, and lumbar spine. (Tr. 660). She also had tenderness in the lumbar spine. (Tr. 660). He assessed her to have medial cord plexopathy and noted that they would consider a breast reduction, but that Plaintiff did not want to try injections due to a phobia of needles after a traumatic

experience as a child. (Tr. 660). On April 18, 2011, Plaintiff had cervical and trapezius muscle spasm, limited range of motion in the neck, facet tenderness, multilevel root tenderness, swelling on the scapular ridge, and ERB's point tenderness bilaterally. (Tr. 815). In the lumbar spine, she had paraspinal muscle spasm and tenderness. (Tr. 815). She had decreased grip strength and her reflexes were "brisk and hyperactive throughout." (Tr. 815). Dr. Vegari continued her medications and ordered wrist splints. (Tr. 816).

On April 21, 2011, an MRI of her cervical spine indicated "straightening of the cervical lordotic curvature," "disc desiccation of the C5-6 disc with a moderate central C5-6 disc herniation extending to the cervical cord without compression," "at C6-7 disc, there is a broad protrusion, which is a broad herniation without cord impingement," and a "broad disc protrusion across the C4-5 disc and C3-4 disc with normal cervical cord." (Tr. 710). On April 25, 2011, an EMG indicated subacute root irritation at C6 and bilateral carpal tunnel syndrome. (Tr. 711).

On May 12, 2011, Plaintiff followed-up with Dr. Vegari. (Tr. 813). She had cervical and trapezius muscle spasm, limited range of motion in the neck, facet tenderness, multilevel root tenderness, swelling on the scapular ridge, and ERB's point tenderness bilaterally. (Tr. 813). In the lumbar spine, she had paraspinal muscle spasm and tenderness. (Tr. 813). She had swelling, tenderness, and decreased range of motion in her left hip, decreased grip strength and her reflexes

were "brisk and hyperactive throughout." (Tr. 814). He continued her medications and wrist splints and ordered additional diagnostic studies. (Tr. 814).

On May 25, 2011, Plaintiff had a neurosurgery consultation with Dr. Stephen Campbell, M.D. (Tr. 819). Her physical exam indicated normal strength and reflexes. (Tr. 821). He noted that her MRI shows disc bulges at C5-6 and C6-7 and her EMG that showed possible C6 nerve root irritation. (Tr. 822). He wrote that Plaintiff's "exam is normal and her symptoms are more consistent with a C7 process. I do not recommend surgery for this patient." (Tr. 822).

On June 14, 2011, an MRI of her left hip indicated "minimal area of increased T2 signal in the left acetabulum possibly a degenerative change or a bone bruise" and "a fluid-filled bowel loop anteriorly on the right." (Tr. 830).

### B. Opinion Evidence

As discussed *supra,* on December 2, 2005, Plaintiff saw Jennifer Manso, PA-C, at the Neurology Center who "advised [her] not to lift any heavy objects greater than 5 to 10 lbs and avoid pushing and pulling type activities." (Tr. 416).

On May 10, 2007, state agency physician Dr. Sethuraman Muthiah, M.D., performed a consultative exam. (Tr. 479). Her musculoskeletal exam "[r]evealed multiple areas of tenderness in the cervical, thoracic as well as in the lumbar region. She has paraspinal muscle spasm in the cervical as well as in the lumbar region. She took a long time in getting on and off the examination table and getting

[up] from a supine position. She has tenderness in the left shoulder region mainly in the anterior aspect. She also has minimal swelling of the right knee and the left knee and medical aspect tenderness in the left knee." (Tr. 481). Objective findings also included reduced range of motion in her shoulder, hip, cervical spine, lumbar spine, and ankle, and an antalgic gait. (Tr. 477-78, 482).  Dr. Muthiah opined that Plaintiff could only stand and walk for about one to two hours and sit for about two hours. (Tr. 475, 482). He also opined that she could perform "postural activities occasionally," specifically bending, kneeling, stooping, crouching, balancing, and climbing. (Tr. 476, 482).

On May 31, 2007, Dr. Leo Potera, M.D., reviewed Plaintiff's file and completed a physical RFC. (Tr. 495). He opined that Plaintiff could perform light work, but also opined that she was limited to only occasionally climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 493).

On September 5, 2007, Dr. Tiffany Griffiths, Psy.D, performed a consultative exam. (Tr. 505). Dr. Griffiths observed that her "thought process, specifically her train of thought, does seem to be easily interrupted…[h]er concentration was poor as indicated by poor performance on the serial 7s task…[i]nsight was poor." (Tr. 505). She opined that because Plaintiff had poor concentration and loses her thought easily, she would have slight problems understanding, remembering, and carrying out short, simple instructions and

moderate limitations in understanding, remembering, and carrying detailed instructions, along with making judgments on work-related decisions. (Tr. 501).

On September 13, 2007, Dr. Dennis Gold, Ph.D. reviewed Plaintiff's file and opined that her mental impairments were not severe. (Tr. 507).

On September 14, 2007, Dr. Syed Viqar, M.D., submitted a mental RFC. (Tr. 520). He opined that Plaintiff's concentration was "poor" and that she lacked motivation. (Tr. 523). He also opined that she would have slight difficulties in interacting with coworkers and supervisors and moderate limitations in responding to work pressures and changes in a routine work setting. (Tr. 522).

On May 17, 2010, Dr. Vegari "advised her not to lift any heavy objects of more than 5-10 pounds and avoid pushing and pulling-type activities." (Tr. 642).

On October 14, 2010, Dr. Muthiah performed a second consultative exam. (Tr. 664). Again, he opined that she could only stand and walk for about two hours and sit for about two hours. (Tr. 663). He opined that she needed to be limited to bending, kneeling, stooping, crouching, balancing, and climbing occasionally. (Tr. 664). On physical exam, she had decreased range of motion in her shoulders and knees. (Tr. 667). She also had decreased range of motion in her hip, cervical spine, and lumbar spine. (Tr. 668). She weighed 277 pounds. (Tr. 671). She was "frequently tearful and anxious during the examination." (Tr. 671). Her exam also "revealed muscle spasm and tenderness in the cervical and upper thoracic and in

the lumbar region. She took a long time in changing position from sitting to supine and supine to sitting up." (Tr. 672). She also had an antalgic gait. (Tr. 673).

On October 25, 2010, Plaintiff had a consultative exam with Dr. Bernard Seif, Ed.D. (Tr. 676).  She "would not attempt to reverse" serial 7s because she "reported that she was not able to concentrate to that extent." (Tr. 677). He opined that her prognosis was poor. (Tr. 677). He wrote that her "ability to concentrate and follow-through is impaired even though her motivation to be cooperative is strong. This generates a great deal of conflict and emotional distress." (Tr. 677). He opined that she had moderate limitations in her ability to make judgments on simple work-related decisions, marked limitations in understanding, remembering, and carrying out short, simple instructions, and extreme limitations in understanding, remembering, and carrying out detailed instructions. (Tr. 678). He assessed marked limitations in her ability to interact with the public, coworkers, and supervisors and to respond appropriately to changes in a routine setting, and extreme limitations in her ability to respond to work pressures. (Tr. 678).

On November 9, 2010, Dr. Leo Potera, M.D., reviewed Plaintiff's file again and completed a physical RFC assessment. (Tr. 684). He opined that she was limited to occasionally climbing, balancing, stooping, kneeling, crouching, and crawling, but could never climb ropes or scaffolds. (Tr. 682). He opined that she was limited in her ability to reach in all directions (including overhead). (Tr. 682).

He opined that she could stand or walk for about six hours in an eight-hour day and sit for about six hours in an eight-hour day. (Tr. 681). He opined that she should avoid repetitive pushing and/or pulling with her upper extremities. (Tr. 681). He also opined that she should avoid concentrated exposure to extreme heat, humidity, hazards, fumes, odors, dusts, and gases. (Tr. 683).

On November 10, 2010, Dr. Mrykalo, Ed.D, reviewed Plaintiff's file and competed a mental RFC. (Tr. 692). He opined that she had mild limitation in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 702). He opined that she was moderately limited in her ability to maintain attention and concentration for extended periods. (Tr. 706). He opined that she was markedly limited in her ability to understand, remember, and carry-out detailed instructions. (Tr. 706). He opined that she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact with the public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 707). He opined that she was "reasonably capable of: coping with minor work related demands; make simple work related

decisions; follow simple 1-2 task directives; perform simple routine type tasks of a repetitive nature; comprehend and retain simple task instructions." (Tr. 708).

## C. Findings

On August 23, 2011, the ALJ issued the decision that is the subject of the present appeal. (Tr. 28). At step one, he found that Plaintiff had not engaged in substantial gainful activity since September 6, 2006, the alleged onset date. (Tr. 29). At step two, he found that her degenerative disc disease of spine, thoracic outlet syndrome, fibromyalgia, personality disorder and depression were medically determinable and severe. (Tr. 29). At step three, he found that she did not meet or equal a Listing. (Tr. 29). He found that she had the RFC to perform sedentary work, with an option to sit and stand every fifteen minutes, avoid bilateral upper extremity overhead reaching, could perform up to frequent handling, fingering, feeling, touching and grasping, could not interact with the public and could only occasionally interact with co-workers and supervisors. (Tr. 31). At step four, the ALJ found that Plaintiff could not perform past relevant work, but at step five, he found that she could perform other work in the national economy as a "protective service worker." (Tr. 36-38). As a result, the ALJ found that she was not disabled and not entitled to benefits.

## VI.    Plaintiff Allegations of Error

### A.    Limitations in Concentration, Persistence, and Pace

Plaintiff asserts that the ALJ erred in failing to assess any limitations relating to concentration, persistence, and pace in the RFC. The ALJ found at step two that Plaintiff had moderate limitations in concentration, persistence, and pace. (Tr. 30). All of the psychiatrists who examined Plaintiff concurred that she had moderate limitations in concentration, persistence, and pace. *Supra.* The ALJ assigned "great weight" to the functional limitations of Dr. Mrykalo, which included moderate limitations in the ability to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 36, 706-07). However, the ALJ did not include any limitations with respect to concentration, persistence, and pace in his RFC or hypothetical to the VE. Dr. Mrykalo also opined that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions, but the ALJ did not limit Plaintiff to simple tasks. (Tr. 706). Plaintiff asserts that this failure violates Third Circuit precedent that requires the ALJ to include nonexertional limitations and adequately convey them in a hypothetical to a vocational expert.

In *Burns v. Barnhart*, 312 F.3d 113 (3d Cir. 2002), the ALJ had found that the claimant had borderline intellectual functioning, and accommodated for this limitation by restricting the claimant to simple, repetitive, one and two-step tasks.

The Third Circuit found that the ALJ's step five determination, based on a VE hypothetical, lacked substantial evidence:

> Here, the ALJ's hypothetical did not refer to any of the type of limitations later outlined in Dr. Laviolette's report. Instead, it merely referred to "simple repetitive one, two-step tasks." This phrase, however, does not specifically convey Burns' intellectual limitations referenced in Dr. Laviolette's report. Rather, it could refer to a host of physical and mental limitations, such as a person's mechanical or small motor skills, his lack of initiative or creativity, or a fear of, or unwillingness to take on, unfamiliar tasks. While the phrase could encompass a lack of intelligence, it does not necessarily incorporate all of the borderline aspects of Burns' intellectual functioning or the other deficiencies identified in Dr. Laviolette's report. For example, it certainly does not incorporate Dr. Laviolette's finding that Burns is borderline in the areas of reliability, common sense, ability to function independently, and judgment, or that he manifests flightiness, disassociation, oppositional tendencies, and difficulties in comprehension. As a result, the hypothetical did not include all of the limitations suffered by Burns, thus making it deficient.

*Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). More importantly, the Third Circuit has specifically addressed the need to include moderate limitations in concentration, persistence, and pace in an RFC assessment or VE hypothetical. In *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004), the Court held that a limitation to simple one or two step tasks was not sufficiently specific to convey moderate limitations in concentration, persistence, and pace identified on a Psychiatric Review Technique Form ("PRTF"):

> These limitations do not adequately convey all of Ramirez's limitations. The Commissioner contends that the limitation to one to two step tasks is sufficient, but we agree with the Magistrate Judge that a "a requirement that a job be limited to one to two step tasks, as was stated in the hypothetical relied upon by the ALJ, does not adequately encompass a finding that

[Ramirez] 'often' has 'deficiencies in concentration, persistence, or pace,' as was noted by the ALJ both in her decision and on the PRTF attached to the decision." Most importantly, this limitation does not take into account deficiencies in pace. Many employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time.

…

This omission from the hypothetical runs afoul of our directive in *Chrupcala* that a "hypothetical question posed to a vocational expert 'must reflect *all* of a claimant's impairments," *Chrupcala,* 829 F.2d at 1276, as well as our statement in *Burns* that "great specificity" is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical. *Burns,* 312 F.3d at 122. Indeed, the SSA's own ruling requires a "more detailed assessment" of the claimant's mental limitations at step five of the disability analysis. *See* SSR 96–8p (July 2, 1996).

*Ramirez v. Barnhart*, 372 F.3d 546, 554-55 (3d Cir. 2004).

Judge Jones recently addressed this issue, and remanded pursuant to

*Ramirez*:

In order for a vocational expert's answer to a hypothetical to be considered substantial evidence, the question must reflect "*all* of the claimant's impairments that are supported by the record." *Allen v. Barnhart,* 417 F.3d 396, 407 (3d Cir.2005) (emphasis in original). Courts within the Third Circuit have repeatedly held that an ALJ's failure to include moderate limitations involving concentration, persistence, or pace in the hypothetical posed to the vocational expert constitutes error warranting remand. *See Ramirez v. Barnhart,* 372 F.3d 546, 554 (3d Cir.2004) ("a requirement that a job be limited to one to two step tasks, as was stated in the hypothetical relied upon by the ALJ, does not adequately encompass a finding that [Plaintiff] often has deficiencies in concentration, persistence, or pace, as was noted by the ALJ ..."); *see also Corona v. Barnhart,* 431 F.Supp.2d 506, 516 (E.D.Pa.2006) ("the ALJ's determination that Plaintiff suffers mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration is not properly reflected in her hypothetical question to the VE."); *Thompson v. Barnhart,* 2006 WL 709795, at *14–15 (E.D.Pa. March 15, 2006); *Barry v.*

*Barnhart,* 2006 WL 2818433, at *10 (E.D.Pa.Sep.28, 2006) ("the record as a whole demonstrates that [the plaintiff] suffered from at least moderate limitations in maintaining concentration, persistence, or pace, and that limitation should have been included in the hypothetical question."); *Colon v. Barnhart,* 424 F.Supp.2d 805, 814 (E.D.Pa.2006) ("When an ALJ incorporates a claimant's limitations into a hypothetical, 'great specificity' is required.").

Here, the ALJ found that the claimant had moderate difficulties in social function, that "[w]ith regard to concentration, persistence, or pace, the claimant has moderate difficulties," and that the "claimant has mental impairments which by their nature are likely to interfere with an individual's ability to concentrate." (Brady Decision, p. 4). The hypothetical scenario posed to the vocational expert incorporated a limited social function, as the hypothetical individual was "limited to jobs which has no interaction with the public and only occasional interaction with coworkers and supervisors." (Hearing Transcript, p. 21). Although the scenario presented to the vocational expert did limit the hypothetical individual to "simple and routine" jobs, defined as "unskilled with no more than an SVP:2," it failed to include deficiencies in concentration, persistence, or pace. (Hearing Transcript, p. 21). The ALJ found as a factual matter that Miller suffers moderate difficulties with concentration, persistence, or pace, but failed to address that limitation in the hypothetical scenario presented to the vocational expert. Thus, the ALJ erred by neglecting to include all of Plaintiff's limitations that were supported by the record. Accordingly, the matter will be remanded for further proceedings consistent with this Memorandum.

*Miller v. Colvin*, No. 3:13-CV-0034, 2014 WL 1910495, at *4-5 (M.D. Pa. May

13, 2014) (Jones, J.).

Defendant contends that, pursuant to Dr. Mrykalo's opinion, "Plaintiff could

nevertheless perform the demands of simple and routine unskilled work." (Def.

Brief at 23). Here, unlike *Burns* and *Ramirez*, the ALJ did not even limit Plaintiff

to unskilled work or to work that involves only simple or routine tasks. (Tr. 33-38).

Defendant also asserts that a distinction between "often" and "moderate" means that *Ramirez* does not apply. (Def. Brief at 23).  However, the undersigned has previously cited to another recent case by Judge Jones that rejected this argument:

> At the time *Ramirez* was issued, the regulations rated the relevant limitations on a frequency continuum: "never," "seldom," "often," "frequent," and "constant." Revised in 2000, the present system rates mental impairments in terms of severity: "none," "mild," "moderate," "marked," and "severe ." *See Colon v. Barnhart,* 424 F.Supp.2d 805, 811 (E.D.Pa.2006) (explaining the revisions). Various district courts have concluded that a rating of "often" under the former system is equivalent to "moderate" under the present system, as both designations fall at the same point on the five-point scales. *See, e.g., id.; Dynko v. Barnhart,* No. 03–cv–3222, 2004 WL 2612260, at *5 n. 34 (E.D.Pa. Nov.16, 2004).

*Gray v. Colvin*, No. 3:13-CV-01944-GBC, 2014 WL 4536552, at *15-16 (M.D. Pa. Sept. 11, 2014) (Cohn, M.J) (quoting *Keefer v. Astrue*, 3:12-CV-1665, 2014 WL 1095726 n. 10 (M.D. Pa. Mar. 19, 2014) (Jones, J.)). As the undersigned explained in *Gray*:

> Other courts have relied on nonprecedential opinions, *McDonald v. Astrue,* 293 Fed. Appx. 941, 946 & n. 10 (3d Cir.2008) and *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir.2008), to conclude that *Ramirez* does not apply to cases after 2000 that use the severity scale instead of the frequency scale. However, *Menkes* did not even mention *Ramirez,* even though it was directly on point. Another District Court has explained why *McDonald* is not persuasive:
>
> > The Commissioner does not dispute that the ALJ did not include in his hypothetical question any explicit limitation in line with his finding that Plaintiff had "moderate difficulties" with concentration, persistence, or pace. Rather, the Commissioner first argues that *Ramirez'* s holding has been narrowed by the subsequent decision of

*McDonald v. Astrue,* 293 F. App'x 941, 946–47 (3d Cir.2008). I need not address this argument in much detail because regardless of *McDonald'* s holding, that decision is not precedential. *See* Third Circuit Internal Operating Procedure 5.7 (indicating that nonprecedential "opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing"); *In re: Grand Jury Investigation,* 445 F.3d 266, 276 (3d Cir.2006) (explaining that because the Third Circuit's Internal Operating Procedures do not regard non-precedential opinions as precedent binding upon itself, these non-precedential opinions "are not precedents for the district courts of this circuit"). Thus, *Ramirez* remains the controlling law of this circuit, binding on this Court.

*Boyle v. Colvin,* 12–4724 FLW, 2014 WL 3556507 at *11 (D.N.J. July 18, 2014). The Court also finds the following rationale persuasive:

Citing *McDonald v. Astrue,* 293 Fed. Appx. 941, 946 & n. 10 (3d Cir.2008) *(non precedential),* the Commissioner argues that the difference in nomenclature between "moderate" and "often" means that *Ramirez* is inapposite. Def.'s Br. at 14–15. However, *Strouse* and *Weinsteiger* provide convincing explanations for why *McDonald* does not undermine the *Ramirez* rule as it is applied in this district. *See Strouse,* 2010 WL 1047726, at *6 (explaining that *McDonald* failed to address the change in regulatory terminology and the nomenclature change was not dispositive, because there was a lack of record support for McDonald's asserted functional limitations); *Weinsteiger,* 2010 WL 331903, at *10 & n. 3 (noting that *McDonald* is not precedential and, as explained in *Bunch v. Astrue,* 2008 WL 5055741, *5 & n. 4 (E.D.Pa.Nov.26, 2008), the change in regulatory terminology does not circumvent *Ramirez's* requirement that hypothetical questions accurately convey the limitations the ALJ has found).

*Plank v. Colvin,* CIV. 12–4144, 2013 WL 6388486 (E.D.Pa. Dec.6, 2013).

*Gray v. Colvin*, 2014 WL 4536552 at *16. *Ramirez* applies to this case, and the ALJ erred in failing to include any limitations relating to concentration, pace, simple or routine tasks, unskilled work, or any other non-exertional limitation.

For some challenges based on *Ramirez*, a harmless error assessment may be appropriate. For instance, although the ALJ failed to limit Plaintiff to simple tasks, if the VE identified jobs that required only simple tasks, the failure would be harmless. However, it is impossible to determine whether the error was harmless because the VE did not clearly identify the single position Plaintiff could supposedly perform or provide any DOT codes.

Based on the ALJ's RFC, the VE testified that Plaintiff could only perform work as a "protective service worker." (Tr. 105). The VE did not identify the Dictionary of Occupational Title ("DOT") code for this position, and no position by that title exists in the DOT. Plaintiff contends that the VE meant to describe a position known as "Caseworker, Protective Services," while Defendant contends that the VE meant to describe a position known as "systems monitor." (Pl. Brief at 18); (Def. Brief at 25-26). The Court has no way to determine what the VE meant, and cannot speculate despite the urging of the parties.  This precludes meaningful review. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119-20 (3d Cir. 2000). The Court recommends remand for the ALJ to properly evaluate non-exertional limitations in the RFC and elicit proper vocational testimony.

## B.     Assignment of Weight to the Medical Opinions

Although the Court recommends remand based on the above discussion, the Court will address Plaintiff's other contentions given that she initially filed this

application almost eight years ago and has already undergone an arduous process to obtain proper consideration by an ALJ. For the reasons that follow, the Court also recommends remand on the ground that the ALJ failed to provide any reason whatsoever to discount limitations in three opinions: Dr. Potera's 2007 opinion, Dr. Muthiah's 2007 opinion, and Dr. Potera's 2010 opinion. The ALJ also failed to provide a proper reason to reject Dr. Muthiah's 2010 opinion.

An ALJ must acknowledge and weigh every medical opinion. 20 C.F.R. §404.1527(c) ("[W]e will evaluate every medical opinion we receive"). 20 C.F.R. §404.1527(c) establishes the factors to be considered by the ALJ when weighing medical opinions. Under 20 C.F.R. §§404.1527(c)(1) and (2), the opinions of treating physicians are given greater weight than opinions of non-treating physicians and opinions of examining physicians are given greater weight than opinions of non-examining physicians. 20 C.F.R. §404.1527(c)(2) also differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. 20 C.F.R. §404.1527(c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §404.1527(c)(5) provides more weight to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion."

As an initial matter, Dr. Muthiah's opinion in 2007 would have precluded Plaintiff from performing even sedentary work. (Tr. 482). However, in the February 2010 decision, the ALJ wrote that Dr. Muthiah "stated she was able to perform light exertional work." (Tr. 157). The ALJ then wrote that his RFC, which indicated that Plaintiff could engage in a range of sedentary work, was "more limited than found by Dr. Muthiah." (Tr. 163). The ALJ did not address this error in the August 2011 decision, writing instead that "the undersigned hereby incorporates the prior analysis of evidence into this decision by reference." (Tr. 34). Thus, the ALJ mischaracterized Dr. Muthiah's 2007 opinion and rejected it without providing explanation. This requires remand. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects").

The ALJ also never acknowledged the 2010 medical opinion by Dr. Potera. In 2010, Dr. Potera opined that Plaintiff had postural limitations that were not included in the RFC by the ALJ. (Tr. 682).  The ALJ addressed Dr. Potera's 2007 opinion, along with Dr. Gold's opinion, in the 2010 decision, writing "[t]he undersigned considered the State Agency opinions and finds that the claimant is more limited than found by the state agency." (Tr. 163). Again, however, he did not find that Plaintiff was more limited than Dr. Potera. Although Dr. Potera opined that Plaintiff could perform light work, he also opined that she was limited

to only occasionally balancing, stooping, kneeling, crouching, and crawling. (Tr. 493). The ALJ did not include these limitations in his RFC. This could be significant because "if an individual is limited in balancing even when standing or walking on level terrain, there may be a significant erosion of the unskilled sedentary occupational base."   SSR 96-9p. Thus, the ALJ rejected relevant limitations without explanation, which requires remand. *See Plummer*, 186 F.3d at 429.

The ALJ rejected Dr. Muthiah's 2010 limitations in standing, walking, and sitting for only one reason: because he did "not find objective support for such significant limitations." (Tr. 35). However, a lack of objective evidence, alone, is generally insufficient to reject medical opinions. "[D]isability may be 'medically determined' for purposes of the Act even when a doctor's opinion is not supported by objective clinical findings." *Rossi v. Califano*, 602 F.2d 55, 58 (3d Cir. 1979); *cf.* 20 C.F.R. § 416.929 ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work (or if you are a child, to function independently, appropriately, and effectively in an age-appropriate manner) solely because the available objective medical evidence does not substantiate your statements.").

Moreover, there was ample objective evidence from Dr. Muthiah's own exams and the record that corroborated his opinion. Plaintiff had muscle spasms on

August 24, 2005 in her neck, cervical spine, and lumbar spine, on October 21, 2005 in her cervical and lumbar spine, on December 2, 2005 in her lumbar spine, on February 3, 2006 in her cervical spine, trapezius muscles, thoracic spine, and lumbar spine, on March 17, 2006 in her in her cervical spine, trapezius muscles, and lumbar spine, on May 2, 2006 in her buttock, on December 1, 2006 in her trapezius muscles, on October 15, 2009 in her lumbar spine and trapezius muscles, on December 14, 2009 in her lumbar spine, cervical spine and trapezius muscles, on February 17, 2010 in her lumbar spine, cervical spine and trapezius muscles, on May 17, 2010 in her lumbar spine, cervical spine and trapezius muscles, on August 19, 2010 in her cervical spine and trapezius muscles, on September 29, 2010 in her lumbar, thoracic and cervical spine, on April 18, 2011 in her lumbar spine, cervical spine and trapezius muscles, and on May 12, 2011 in her lumbar spine, cervical spine and trapezius muscles. (Tr. 381, 386, 414, 416, 425, 464, 593-95, 642-43, 845, 660, 814-15).

Plaintiff had limited range of motion in her lumbar spine on October 21, 2005, her neck on December 2, 2005, February 3, 2006, and March 17, 2006, "significantly decreased" range of motion in her cervical spine on December 19, 2006, limited range of motion in her hip on February 5, 2008, decreased range of motion in her cervical spine on October 15, 2009, limited range of motion in her cervical spine on December 14, 2009, limited range of motion in her neck on

February 17, 2010, limited range of motion in her cervical, lumbar, and thoracic spine and sacroiliac joint on March 30, 2010 and April 6, 2010, limited range of motion in the neck on May 17, 2010, August 19, 2010, September 29, 2010, and April 18, 2011, and decreased range of motion in her hip and neck on May 12, 2011. (Tr. 381, 413-14, 416, 474, 593-96, 603, 633-34, 642-43, 645, 660, 814-15).

Plaintiff had brisk reflexes on October 21, 2005, sluggish reflexes on July 18, 2006, August 20, 2006, and September 20, 2006, hyporeflexic reflexes on March 30, 2010, abnormal reflexes in her upper extremity on September 29, 2010, absent reflexes in her left knee and both ankles on September 29, 2010, hyperactive reflexes throughout on April 18, 2011 and May 12, 2011. (Tr. 660, 814-15). Plaintiff had decreased grip strength on October 15, 2009, December 14, 2009, September 29, 2010, April 18, 2011 and May 12, 2011. (Tr. 593-94, 595, 660, 814-15). Plaintiff had swelling in her neck on December 2, 2005, along the scapular ridge on February 3, 2006, in her neck on September 29, 2010, along the scapular ridge on April 18, 2011, and along the scapular ridge and hip on May 12, 2011. (Tr. 381, 414, 416, 660, 814-15).

She had a positive straight leg raise on May 2, 2006, December 14, 2009, and March 30, 2010. (Tr. 425, 594, 633). She had a positive slump test on December 19, 2006, October 15, 2009, and December 14, 2009. (Tr. 474, 593-94, 596). She had a positive Spurling test on October 15, 2009, December 14, 2009.

(Tr. 593-95). She had active trigger points on April 8, 2008, March 30, 2010, April 6, 2010. (Tr. 538, 633-34). She had a positive Erb's point tenderness on September 29, 2010, April 18, 2011 and May 12, 2011. (Tr. 660, 814-15). She had a positive facet loading test on April 8, 2008. (Tr. 538). She had twelve of the eighteen pressure points associated with fibromyalgia on October 15, 2009 and fourteen of the eighteen pressure points on December 14, 2009. (Tr. 593-94, 596). She had a positive empty can, full can, and Neer impingement sign on October 15, 2009. (Tr. 596). She had a positive Braggard's sign on March 30, 2010. (Tr. 633).

Plaintiff's imaging documented cervical degeneration that worsened throughout the relevant period, including disc desiccation, herniation, and bulge that eventually impinged on the thecal sac, subacute to acute C6 nerve root irritation, "straightening of the cervical lordotic curvature," and "broad" disc protrusions that worsened during the relevant period; lumbar degeneration that worsened throughout the relevant period, including lumbar disc desiccation, herniation, and bulge that eventually impinged on the thecal sac, disc space narrowing, "narrowing of the neural foraminal at the level of L4-L5 and L5-S1 bilaterally," and subacute S1 root irritation; and thoracic degeneration that worsened during the relevant period, including thoracic disc desiccation, a broad thoracic disc protrusion, and a disc herniation that eventually impinged on the thecal sac. (Tr. 387, 419-20, 423, 529-31, 533-34, 605, 610-611, 647, 710-711).

The ALJ acknowledged that Plaintiff had "mild to moderate degenerative changes" with "straightening of the lordotic curvature and herniations from C3 to C6" but concluded that these objective findings did not provide objective support for the limitations because there was no "cord compression" or abnormalities in the neural foramen. The ALJ also acknowledged that Dr. Vegari's EMG indicated "abnormalities consistent with root irritation on the right and left at C6" and "some peripheral neuropathy across both wrists consistent with carpal tunnel syndrome," but concluded that these objective findings did not provide objective support for the limitations because Dr. Vegari did not make "any additional recommendations to the claimant with respect to her care as a result of these findings." (Tr. 35). However, the ALJ has no medical training, and did not rely on any medical expert testimony to conclude that the objective findings were insufficient to support Dr. Muthiah's opinion. This constitutes an impermissible lay interpretation of medical evidence:

> We also note that the ALJ acted improperly in discrediting the opinions of Dr. Scott by finding them contrary to the objective medical evidence contained in the file. By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence. Again, if the ALJ believed that Dr. Scott's reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). Like the ALJ in *Ferguson*, the ALJ here independently reviewed and interpreted the medical evidence to

conclude that Dr. Muthiah's opinion was contrary to the objective medical evidence. This independent review was improper.

Additionally, relying on a lack of objective evidence is particularly inappropriate when fibromyalgia, and other diseases for which there may be a lack of objective evidence, is alleged:

> [M]any courts have determined that a disability case involving a diagnosis of fibromyalgia presents a particular need for a close examination of the evidence due to the nature of the disease. *See Henderson v. Astrue,* 887 F.Supp.2d 617, 636 (W.D.Pa.2012) (citing *Lintz v. Astrue,* Civil Action No. 08–424, 2009 WL 1310646 (W.D.Pa. May 11, 2009)); *see also Perl v. Barnhart,* Civil Action No. 03–4580, 2005 WL 579879 (E.D.Pa. Mar.10, 2005). Some courts have found error where the ALJ relied on the lack of objective evidence in making the determination that the claimant was not disabled. *Id.* "Symptoms associated with fibromyalgia include pain all over, fatigue, disturbed sleep, stiffness, and tenderness occurring at eleven of eighteen focal points." *Lintz,* 2009 WL 1310646, at *7 (citing *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996)). Particularly because "fibromyalgia patients often manifest normal muscle strength and neurological reactions and have a full range of motion," *Lintz,* 2009 WL 1310646, at *7 (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 244 (6th Cir.2007) (internal quotation omitted)), an ALJ must be cautions in relying on objective findings and undermining subjective ones. *Lintz*, 2009 WL 1310646, at *8–11; Rogers, 486 F.3d at 244–46.

*Watkins v. Colvin*, 3:11-CV-1635, 2013 WL 1909550 at *10 (M.D. Pa. May 8, 2013) (Conaboy, J.).

The ALJ provided no other reason to discount Dr. Muthiah's opinion. Because, in this case, the ALJ was not entitled to rely on his inference that objective evidence failed to support the opinion, he did not demonstrate substantial evidence to reject his opinion.

Defendant contends that the ALJ also concluded that Dr. Muthiah's opinion was inconsistent with the evidence of record, but that is just a repackaged way of saying that it was not supported by objective evidence. (Def. Brief at 18). Defendant discusses Plaintiff's activities of daily living, but the ALJ did not mention these in his assessment of Dr. Muthiah's opinion. (Tr. 36). An ALJ may not reject an opinion based on a "credibility judgment." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000). Regardless, the ALJ did not identify any evidence that actually contradicted Dr. Muthiah's opinion or Plaintiff's testimony that she would require breaks throughout the day, precluding her from working eight-hours, regularly and continually.

Activities of daily living can generally only support an adverse credibility finding if (1) the activities of daily living indicate that "a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting" or (2) the activities of daily living contradict other allegations by the claimant, rendering them internally inconsistent. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). This is because a finding of non-disability requires that a claimant be able to "do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Titles II & Xvi: Assessing Residual Functional*

*Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996). The Third Circuit has repeatedly reaffirmed that activities of daily living which do not indicate transferable job skills for a regular and continuing basis cannot be used as substantive evidence of non-disability. *Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity….It is well established that sporadic or transitory activity does not disprove disability"); *Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir. 1987); *Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity.") (internal citations omitted).

The Court in *Smith v. Califano* adopted the "sporadic and transitory" language from *Wilson v. Richardson*, 455 F.2d 304 (4th Cir. 1972), where the claimant had temporarily worked at eleven jobs over a three-year period and was working forty hours per week at the time of the hearing. *Id.* at 307. However, the Court found that this was not evidence that the claimant was not disabled, explaining that:

> Section 404.1534(a) includes the following illustration:
> Where an individual is forced to discontinue his work activities after a short time because his impairment precludes continuing such

activities, his earnings would not demonstrate ability to engage in substantial gainful activity.

We point out, without deciding, that under this language or the principle the Regulation embodies, Wilson's sporadic and transitory activities may demonstrate not his ability, but his inability to engage in substantial gainful activity.

*Id.* The regulation continues, "[g]enerally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity."   20 C.F.R. § 404.1572.

The ability to care for children, alone, does not inherently indicate that a claimant possesses the ability to perform on a regular and continuing basis in a work-setting. First, the skills of caring for a child in one's own home differ from the stress of a work-setting. *Harsh v. Colvin*, No. 3:13-CV-42 GLS, 2014 WL 4199234, at *4 (N.D.N.Y. Aug. 22, 2014) ("[T]he ALJ placed undue emphasis on Harsh's ability to perform a 'wide range of daily activities,' including doing some cooking, cleaning, laundry, and shopping, sitting on her porch, reading, and caring for her kids. Under the circumstances and given the medical opinions of record, it was error for the ALJ to infer an ability to handle the stress demands of competitive, remunerative employment on a sustained basis from the ability to perform very basic activities of daily living."); *Draper v. Barnhart*, 425 F.3d 1127, 1131 (8th Cir. 2005) ("[T]he test is whether the claimant has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and

stressful conditions in which real people work in the real world.' In other words, evidence of performing general housework does not preclude a finding of disability.") (internal quotations omitted).

Second, caring for children allows for flexibility and rest breaks. *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005) (Caring for a child "has a degree of flexibility that work in the workplace does not."); *Piatt v. Barnhart*, 225 F. Supp. 2d 1278, 1291 (D. Kan. 2002) (Remanding in part because "[a]lthough Plaintiff cares for three children between the ages of 7 and 13, and cooks and performs some household tasks, she is limited by her inability to stoop or reach down; by back, leg and arm pain after a period of activity; and by her need to take 10 to 15 minute breaks while cooking and doing household tasks."); *Pen v. Astrue*, No. 12-CV-01041 NC, 2013 WL 3990913, at *10 (N.D. Cal. Aug. 2, 2013) (Remanding where "the ALJ determined from [claimant's] statements that she is able to care for her children, drive, and shop, that she is, therefore, more active than she claims" but "the ALJ was incorrect in concluding that this is evidence of her ability to work outside of the home when the demands of a workplace environment do not afford the same opportunities for breaks, rest, or assistance."); *see generally Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons

... and is not held to a minimum standard of performance, as [one] would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."); *Moss v. Colvin*, No. 1:13-CV-731-GHW-MHD, 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("There are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job."); *Cooke v. Colvin*, No. 4:13-CV-00018, 2014 WL 4567473, at *15 (W.D. Va. Sept. 12, 2014) ("[D]aily activities differ from the requirements of gainful employment in several important respects. A person has flexibility in scheduling his daily activities, can get help from other persons, and is not held to a minimum standard of performance; by contrast, an employer expects an employee to perform tasks proficiently, independently, and in a timely manner.") (internal citations omitted).

Moreover, parents may go to great lengths to care for their children that would not be sustainable in the workplace, and should not be discouraged from doing so. *See, e.g. Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (Claimant "*must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts. A person

can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working.") (emphasis in the original) (internal citations omitted); *Vergara v. Astrue*, No. 1:10-CV-00341, 2011 WL 4452198, at *7 (N.D. Ind. Sept. 26, 2011) ("[D]ire circumstances can force an individual to perform work activities that he may not be able to otherwise sustain."); *McHenry v. Astrue*, No. CIV.A. 07-1360, 2008 WL 3068864, at *13 (W.D. Pa. Aug. 5, 2008) (Caring for elderly parents does not negate disability, as it may be the result of "heroic efforts"); *Moss v. Colvin*, No. 1:13-CV-731-GHW-MHD, 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("[P]eople should not be penalized for enduring the pain of their disability in order to care for themselves.") (internal citations omitted)

Third Circuit precedent supports the use of child-care to discount credibility if it contradicts a claimant's limitations or symptoms, but not to ultimately conclude that a claimant is not disabled. Defendant argues that *Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 188 (3d Cir. 2007) allows ALJs to conclude that child-care negates disability. However, this case is not binding precedent. CTA3 App. I, IOP 5.7 ("Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing"). Moreover, the Court in *Horodenski* noted that, at the hearing, the claimant testified that her mother-in-law cared for her house and child. This was inconsistent with

testimony in a prior proceeding that the claimant cared for her house and child. In other words, the ALJ was not relying on her ability to care for a child to conclude that she could work. He was relying on the fact that her testimony was inconsistent. The Court specifically noted this distinction, explaining that:

> Notwithstanding Horodenski's argument to the contrary, our decision in *Fargnoli v. Massanari,* 247 F.3d 34 (3d Cir.2001), does not compel a different result. There, we held, *inter alia,* that "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity." *Id.* at 40 n. 5. To begin with, we disagree that housework and child care—which Horodenski claimed to have been performing daily—constitute "sporadic and transitory activities." *Moreover, unlike the plaintiff in Fargnoli, Horodenski's testimony about her daily activities is not merely significant because of its substance; it was also significant because it was internally inconsistent, which aided the ALJ in determining how much weight to afford to Horodenski's testimony.*

*Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 189 (3d Cir. 2007) (emphasis added).

Defendant also cites to *Rutherford v. Barnhart*, 399 F.3d 546, 555 (3d Cir. 2005) for the premise that an ALJ is allowed to consider child-care. However, *Rutherford*, like *Horodenski*, involved an ALJ who concluded that a claimant's complaints about severe fatigue were inconsistent with her testimony that she could care for her child and grandchild. *Id. Rutherford* then, stands only for the proposition that an ALJ may reject a claimant's credibility when she makes inconsistent claims, not that child-care is not sporadic or transitory. *See also Smith v. Astrue*, 359 F. App'x 313, 317 (3d Cir. 2009) (claimant's testimony that she was

essentially bedridden contradicted by evidence that she had been primary caretaker for small child for two years).  Thus, there is no binding or precedential Third Circuit precedent that allows an ALJ to use child-care as substantive evidence of ability to work on a regular and continuing basis.

Similarly, homeschooling does not inherently translate into an ability to work. As discussed above, a finding of non-disability requires a finding that a claimant can engage in work with regularity. However, a parent who is homeschooling their child can take breaks as needed. *Jackson v. Comm'r of Soc. Sec.*, No. CIV S-06-2028-CMK, 2009 WL 3157506, at *12 (E.D. Cal. Sept. 28, 2009) (Claimant home-schooled her son, but only spent "about half an hour checking his work and reading what he has written, which she can do lying down."). In Pennsylvania, parents who are homeschooling only need to engage in 900 hours of "instruction" per year. 24 Pa. Cons. Stat. Ann. § 13-1327.1(c) (West). If homeschooling occurred continuously throughout the year, that would only be 17 hours week. If homeschooling occurred 40 weeks out of the year, that would only be 22.5 hours per week. Moreover, the Third Circuit has noted that there is no strict oversight in Pennsylvania to ensure that parents are providing 900 hours of instruction per year. *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 239-40 (3d Cir. 2008).

Thus, the same logic applies to homeschooling: it can be used to show that Plaintiff's claims are internally inconsistent, but, where there is no inconsistency, should not be used as substantive proof that a claimant is not disabled. *Compare McCoy v. Astrue*, No. 4:09CV3155, 2010 WL 3526378, at *7 (D. Neb. Sept. 3, 2010) *aff'd,* 648 F.3d 605 (8th Cir. 2011) (Claimant's ability to home-school his daughter was internally inconsistent with his claims that he was not able to "do 'anything' at home."); *Williams v. Barnhart*, 140 F. App'x 932, 936 (11th Cir. 2005) (claimant's allegation that his low I.Q. precluded him from even unskilled work contradicted by his ability to home school his high school daughter); *Harris v. Astrue*, No. CIV.A. CV508-022, 2009 WL 2905736, at *6 (S.D. Ga. June 2, 2009) *report and recommendation adopted,* No. CV508-022, 2009 WL 2913966 (S.D. Ga. Sept. 10, 2009) (Claimant's ability to homeschool her teenage daughter was "very inconsistent with her allegations of being mentally retarded and having such significant memory and mental problems that she is unable to take care of her own personal needs or perform basic daily activities.") *with Blum v. Astrue*, No. C06-3029-MWB, 2007 WL 1521587, at *3 (N.D. Iowa May 22, 2007) (Reversing and remanding where ALJ improperly relied on evidence that claimant spent four to five hours per day home-schooling her two daughters, which was not inconsistent with her need to change positions and activities frequently to avoid an exacerbation of pain); *Rutherford v. Barnhart*, No. CIV.A. 3:06-00483, 2008 WL

2018042, at *24 (M.D. Tenn. May 9, 2008) (Reversing and remanding ALJ's improper rejection of claimant's testimony and medical opinions on the ground that she homeschooled her children; claimant's ability to homeschool her children was not inconsistent with her claims that headaches severely limited her homeschooling); *Fleming v. Astrue*, No. 1:09CV373, 2010 WL 649742, at *8 (N.D. Ohio Feb. 19, 2010) (Claimant's activities that included "helping to home school her grandchildren, caring for her personal needs, preparing simple meals, doing laundry, cleaning, driving, shopping, and managing her finances" constituted "minimal daily functions" on which the ALJ was not entitled to rely, particularly where Claimant testified that "frequent rests are needed."); *Goodridge v. Astrue*, No. 4:11CV210 CDP, 2012 WL 234654, at *10 (E.D. Mo. Jan. 25, 2012) (ALJ was not entitled to reject medical opinions that claimant could not sit, stand, or walk for the required eight-hour work day on the basis of inconsistencies with other evidence, including ability to homeschool her children).

Here, neither Defendant nor the ALJ identified how Plaintiff's claims regarding her ability to care for and educate her son contradicted any of her other claims. Unlike *Horodenski* and *Rutherford*, her ability to care for her child does not create any internal inconsistency with her testimony. Nor does it undermine Dr. Muthiah's opinion that she was capable of performing certain tasks, but not for the requisite eight-hour workday. Consequently, the ALJ and Defendant's emphasis on

Plaintiff's child-care and home-schooling is misplaced. Thus, the ALJ provided no legitimate reason to discount Dr. Muthiah's opinion. Consequently, the Court recommends that the ALJ be required to properly evaluate Dr. Muthiah's opinion on remand and, if he rejects these opinions, to provide specific, legitimate reasons.

## C.     Remaining Allegations

Plaintiff also asserts that the ALJ erred in finding her migraines to be non-severe at step two. Although Plaintiff asserted that her migraines cause nausea and vomiting, she did not identify how this would impact functioning at work. (Tr. 479-82). She also did not identify any additional limitations caused by obesity that were not included in the RFC. However, because the Court recommends remand, the ALJ may exercise discretion to reassess the step two evaluation.

The Court also notes that, in the first ALJ decision, the ALJ found that Plaintiff "could not" frequently manipulate. (Tr. 155). In the second decision, the ALJ found that Plaintiff "could" frequently manipulate. (Tr. 31). It is unclear whether the ALJ was entitled to expand Plaintiff's residual functional capacity in the second decision. The Third Circuit has not addressed this issue, but as another District Court explained:

> Considering the evidence outlining Plaintiff's physical and mental difficulties, it is unlikely that the second ALJ's conclusion that Plaintiff could perform work at the light exertional level with no non-exertional limitations could be upheld under the "substantial evidence" standard for the period prior to April 12, 2007, the date of the initial ALJ decision. The Court, however, need not directly address that question because the ALJ's

reconsideration of this issue for the period covered by the initial ALJ decision was clearly impermissible. The relevant portion of 42 U.S.C. § 405(h) provides:

> The findings and decisions of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such a hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided.

42 U.S.C. § 405(h). By its terms, § 405(h) "gives finality to *findings,* as well as decisions, made in previous proceedings between the parties." *Lively v. Secretary of Health & Human Services,* 820 F.2d 1391, 1392 (4th Cir. 1987) (emphasis in original). Although the Court's remand order clearly contemplated a reexamination of Plaintiff's educational level, it did not give the ALJ a license to reconsider the prior determination outlining Plaintiff's residual functional capacity for the aforementioned period. (R. 309–326). The reconsideration of the education level was not a situation in which the ALJ was dealing with a different period of time than the one at issue during the previous proceedings. *Rucker v. Chater,* 92 F.3d 492, 495 (7th Cir.1996). Instead, the ALJ's subsequent determination that Plaintiff was capable of "light work" concerns the same time period for which it had previously been found that he was capable of "sedentary work" with significant nonexertional limitations. Under these circumstances, § 405(h) precluded the ALJ from adjudicating a new residual functional capacity for the period prior to April 12, 2007. *Dennard v. Secretary of Health & Human Services,* 907 F.2d 598, 599–600 (6th Cir.1990). Consequently, these findings were erroneous as a matter of law.[10]

*Harris v. Astrue*, No. 2:09-CV-1406, 2010 WL 2038630, at *9-10 (W.D. Pa. May 19, 2010). Thus, res judicata may have precluded the ALJ from finding that she could frequently finger and handle after initially finding she could not frequently finger and handle. Again, because the Court recommends remand on other grounds, the Court recommends that the ALJ properly analyze whether he may find Plaintiff's RFC to be greater than he initially found.

# VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that

record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: January 28, 2015                             _____s/Gerald B. Cohn_____
                                                    GERALD B. COHN
                                                    UNITED STATES MAGISTRATE JUDGE